Maxine SCOTT, Plaintiff-Appellant,

v.

SEARS, ROEBUCK & CO.,
Defendant-Appellee.

No. 85–1722.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 7, 1985.

Decided Aug. 11, 1986.

As Amended Aug. 12, 1986.

Steven B. Varick, McBride Baker & Coles, Chicago, Ill., for plaintiff-appellant.

Reed R. Kathrein, Arnstein, Gluck, Lehr, Barron & Mulligan, Chicago, Ill., for defendant-appellee.

Before WOOD, Jr., Circuit Judge, and ESCHBACH, Senior Circuit Judge, and CAMPBELL, Senior District Judge.*

WILLIAM J. CAMPBELL, Senior District Judge.

Plaintiff-appellant Maxine Scott appeals the district court's dismissal of her Title VII employment discrimination action at the summary judgment stage (see 605 F.Supp. 1047 (1985)). Scott was employed by defendant-appellee Sears, Roebuck & Co. in 1980. She was a participant in a program Sears was involved in with the Chicago Alliance of Business & Employment Training, Inc. The program's goal was to train women in nontraditional areas of employment. It was subsidized with federal Comprehensive Employment & Training Act (CETA) funds. Scott's entire action against Sears was dismissed, yet on appeal she focuses on the dismissal of three of the charges in her complaint in particular. Two of these charges are that she was subjected to unlawful sexual harassment and that she was wrongfully discharged due to her gender, both in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* Scott claims her allegations surrounding these two charges contain genuine issues of material fact and were dismissed prematurely. The third charge that Scott focuses upon is that her termination violated an implied covenant of good faith and fair dealing under Illinois contract law. She believes the district court incorrectly dismissed this claim as a matter of Illinois law. For the reasons set forth below, we see no error in the district court's rulings and therefore affirm.

The facts advanced by Scott in the fact section of her brief concerning her sexual harassment claim are as follows. Scott was training to become an automobile mechanic at Sears. She was placed at Sears' Orland Park automotive department after completing a required 12-week training course. A senior mechanic named Eddie Gadberry was assigned to give her on-the-job training in fixing brakes. Gadberry's superior was shop manager John Sanders. Sanders reported to department manager Ernest McDowell. Scott claims she was repeatedly sexually harassed by Gadberry, creating a "hostile environment" actionable under Title VII. She claims Gadberry repeatedly propositioned her, would wink at her and also suggested he give her a rubdown. She additionally alleges that when she asked for advice or assistance, Gadberry would often reply, "what will I get for it?" Scott alleges that a brake mechanic named Dave Frazier slapped her on the buttocks and that mechanic Al Williams

---

* The Honorable William J. Campbell, Senior District Judge of the Northern District of Illinois, is sitting by designation.

once told her he knew she must moan and groan while having sex. This is the extent of facts unearthed by Scott in her brief concerning her sexual harassment claim.

The district court adds the following facts. Scott admitted in her deposition Gadberry never explicitly asked her to have sex and never touched her. She claimed he was "basically nice" and considered him her friend. Gadberry's propositioning apparently amounted to requests to take her to a mall restaurant, the "Green Grasshopper," for drinks after work. Despite the fact Gadberry was known to respond "what will I get for it" when Scott asked him for advice, there is no evidence he ever withheld advice from Scott due to her refusal to "give something" in return. Concerning the conduct of other mechanics, there is no indication that any offensive conduct on their part was repeated or relentless. Scott equates the various mechanics' requests to take her out as requests for sex. She believes the mechanics' "suggestive attitudes" created a hostile working environment within the meaning of Title VII sex discrimination law. Yet Scott admits she never complained to Sanders, McDowell or any other supervisory personnel about any of the above.

As for her gender-based discharge claim, the discussion centers around Scott's productivity and a statement made at the time of her dismissal. Scott claims McDowell and Sanders told her she was not required to meet any productivity quotas but that her goal should be to accomplish two to two and one-half brake jobs per day. After approximately nine months, she had reached a two-brake-job per day level.

While Scott admits more experienced mechanics like Gadberry could perform three brake jobs per day, she contends there was insufficient work to keep everyone busy at Sears' Orland Park location. She argues her low productivity was due in part to the fact that she was often assigned to do tire and battery work. Scott claims that when McDowell dismissed her (and the only other woman mechanic named Otis) in July 1981 it was due to her sex. This is evidenced, she claims, by the fact that at the time of her dismissal McDowell told her he "didn't want to pay a woman $7 an hour when he could get a man to do three brake jobs for that." (Scott Dep. 59)

In addressing Scott's gender-based discharge claim, the district court noted Scott was warned three months prior to her dismissal that her productivity was unsatisfactory. The court also noted the absence of any evidence that Gadberry had anything to do with the alleged wrongful termination. It is undisputed that the one time Sanders asked Gadberry to rate her performance Gadberry gave her a favorable rating. Also important is the fact that no mechanics were hired to replace Scott or Ms. Otis. All parties admit business at Sears' Orland Park automotive department was slow.

## SEXUAL HARASSMENT/HOSTILE WORK ENVIRONMENT CLAIM

■ We start by reviewing a few general principles of Title VII sex discrimination law recently enunciated by the United States Supreme Court in *Meritor Savings Bank v. Vinson*, —— U.S. ——, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).[1] The Court has

---

1. The relevant section of Title VII, codified at 42 U.S.C. § 2000e–2(a) and (b) reads:

    (a) It shall be an unlawful employment practice for an employer—

      (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

      (2) to limit, segregate, or classify his employees or applicants for employment in any

way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

    (b) It shall be an unlawful employment practice for an employment agency to fail or refuse to refer for employment, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin, or to classify or refer for employment any individual on the basis of

established that sexual harassment can become so pervasive and debilitating to an employee that its effect can create a "hostile environment" offensive or violative of Title VII. Such severe harassment becomes discriminatory because it deprives the victim (usually female) of the right to participate in the work place on equal footing with others similarly situated. The Court emphasized, ". . . the language of Title VII is not limited to 'economic' or 'tangible' discrimination. The phrase (in Title VII) 'terms, conditions, or privileges of employment' evinces a Congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment." *Id.* (Parentheses added.) See *Los Angeles Department of Water and Power v. Manhart*, 435 U.S. 702, 707, n. 13, 98 S.Ct. 1370, 1375 n. 13, 55 L.Ed.2d 657 (1978); quoting *Sprogis v. United Air Lines, Inc.*, 444 F.2d 1194, 1198 (7th Cir. 1971). The Court cited with approval the Equal Employment Opportunity Commission's (EEOC) expansive definition of "sexual harassment," codified at 29 CFR § 1604.11(a), *et seq.* (1985). Sexual harassment is defined there as, "Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature ..." where "... (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." After *Meritor* there is no mistaking the acceptability of the EEOC definition (and verbiage) found at § 1604.11(a). The Court noted the "hostile environment" principle has been used in the past to identify unconstitutional racial (see *Firefighters Institute for Racial Equality v. St. Louis*, 549 F.2d 506 (8th Cir.1977)), and religious (see *Compston v. Borden, Inc.*, 424 F.Supp. 157 (S.D.Ohio,1976)) discrimination as well as discrimination based on national origin (see *Cariddi v. Kansas City Chiefs Football Club*, 568 F.2d 87 (8th

Cir.1977)). The Court stated, "Nothing in Title VII suggests that a hostile environment based on discriminatory *sexual* harassment should not likewise be prohibited." (Emphasis supplied.) Citing *Henson v. Dundee*, 682 F.2d 897, 902 (11th Cir. 1982), the Court concluded:

"Sexual harassment which creates a hostile or offensive environment for members of one sex is every bit the arbitrary barrier to sexual equality at the workplace that racial harassment is to racial equality. Surely, a requirement that a man or woman run a guantlet (sic) of sexual abuse in return for the privilege of being allowed to work and make a living can be as demanding and disconcerting as the harshest of racial epithets."

*Id.,* —— U.S. at ——, 106 S.Ct. at 2406.

Although the existence of a hostile environment claim due to sexual harassment has been established under Title VII, the threshold issue in individual cases like the one at bar is whether the instances of harassment alleged by the plaintiff rise to a level of "hostility" offensive enough to be considered actionable. In *Meritor* the Supreme Court, citing *Henson*, stated, "For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment'." *Meritor,* —— U.S. at ——, 106 S.Ct. at 2406. (Parentheses supplied.)[2] Hence, the question becomes did the demeaning conduct and sexual stereotyping cause such anxiety and debilitation to the plaintiff that working conditions were "poisoned" within the meaning of Title VII? See *Bundy v. Jackson*, 641 F.2d 934, 944 (D.C.Cir.1981).

In the case at bar, we agree with the district court that the harassment plaintiff was subjected to (even as advanced by plaintiff) was not so severe, debilitating or

---

his race, color, religion, sex, or national origin.

**2.** Note *Katz v. Dole*, 709 F.2d 251, 256 (4th Cir.1983), where it was said "Title VII is not a

clean language act, and it does not require employers to extirpate all signs of centuries-old prejudices."

pervasive that it created an actionable hostile environment claim within the current interpretation of Title VII. Assuming all of the conduct Scott complains of is true, her claim still falls short of what is necessary to maintain an action. Scott complains of being offensively propositioned, yet the only concrete example she raises is Eddie Gadberry's request that she join him at a mall restaurant after work. As for Gadberry's winks and suggestions he. be allowed to give her a rub-down, there is no evidence whatsoever these "hints" were so pervasive or psychologically debilitating that they affected Scott's ability to perform on the job. Furthermore, the comments and conduct of the other mechanics is too isolated and lacking the repetitive and debilitating effect necessary to maintain a hostile environment claim. (Compare the sexual harassment plaintiffs were subjected to in *Meritor, Henson* and *Bundy.*)

We note, not insignificantly, that when deposed Scott admitted she considered Gadberry her friend. Additionally, there is no evidence of Gadberry becoming bitter due to Scott's refusal to entertain his advances. For example, there is no evidence Gadberry, as a senior brake mechanic, ever withheld advice from Scott or placed her in a disadvantageous position at the workplace. Indeed, the one time Gadberry was asked to evaluate Scott's performance, his response was favorable. As the district court noted, Scott is not entitled to a summary judgment ruling in her favor merely because she has raised a fact-oriented issue. She must raise a *genuine* issue of *material* fact in support of her claim. After reviewing all of the facts she advances, we agree with the district court that Scott has failed to meet her burden. She fails to show the conduct she complains of was so intimidating, offensive or hostile that it affected the "terms, conditions or privileges" of her employment at Sears.

Caveat: a major issue discussed in the briefs is Sears' potential liability for the conduct of Gadberry. We note that implicit in that discussion is the assumption that Scott had an actionable Title VII sexual harassment claim based on hostile environment grounds. Since we have held Scott has not demonstrated harassment necessary to maintain a Title VII hostile environment action, we need not address the liability, if any, that Sears, the employer, would have faced if Gadberry, as a senior mechanic, was found to have engaged in conduct violative of Title VII.[3] Because Scott suffered no deprivation of her. rights protected by Title VII, it is impossible for Sears to have breached any duty in this area.

## WRONGFUL DISCHARGE CLAIM

■ Concerning Scott's wrongful discharge claim, plaintiff Scott bears the initial burden of establishing a *prima facie* case in order to survive summary judgment. (See generally *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Box v. A & P Tea Co.,* 772 F.2d 1372, 1377–78 (7th Cir.1985)). We agree with the district court that Scott has failed to establish at least one necessary element of the *prima facie* criteria—that she was qualified for her position. Scott admits that after nine months on the job she was capable of performing only two brake jobs per day. She also admits more experienced mechanics could perform three per day. It is undisputed Scott was warned three months before her discharge her productivity was unsatisfactory. (Scott Dep. p. 46.) While she contends the reason for her lower productivity was that she was often assigned to the tire and battery department to work, this argument does not cut in her favor. Everyone admits Sears did not have sufficient work at its Orland Park automo-

---

**3.** For discussion concerning the issues, factors and background surrounding an employer's liability for the acts of her supervisory or other personnel, see part III of *Meritor* and Justice Marshall's concurring opinion in that case. Additional discussion is found in *Horn v. Duke Homes, Division of Windsor Mobile Homes,* 755 F.2d 599 (7th Cir.1985); *Vinson v. Taylor,* 753 F.2d 141 (D.C.Cir.1985); *Henson; Bundy; Barrett v. Omaha National Bank,* 726 F.2d 424 (8th Cir.1984); and *Rogers v. EEOC,* 454 F.2d 234 (5th Cir.1971).

tive department to keep all its mechanics busy. (Scott Dep. pp. 43–44.) If Sears had to terminate anyone, it would have a legitimate business purpose in terminating the underproductive and previously warned Scott. We note that after Scott's discharge no one was hired to replace her (or Ms. Otis, the other woman employee who was terminated at the same time). Furthermore, the isolated statement of McDowell when discharging Scott that he did not want to pay a woman $7 an hour when he could get a man to do three brake jobs a day for such a price is insufficient in itself to indicate Scott was wrongfully terminated due to her sex. The fact is that McDowell had more experienced and productive mechanics and they were men. The record reveals once Scott was terminated, these men easily absorbed Scott's workload without the need for additional hirings. In closing, it is interesting to note Scott was discharged after her CETA subsidy had ended. As the district court astutely pointed out, the reality of the situation could very well have been that, "Had Sears fired a male employee who *was* exceeding its expected production standards (and who was senior to Scott) in order to keep Scott on the payroll, it would have been vulnerable to a meritorious charge of sex discrimination against the discharged male." Hence, the wrongful discharge claim was properly dismissed.

### IMPLIED COVENANT CLAIM

■ Finally, Scott claims the district court erred as a matter of law in dismissing her claim that her termination violated an implied covenant of good faith and fair dealing pursuant to Illinois state law. We disagree. In her deposition, Scott admits that she never signed a written contract with Sears other than an employment application form, which explicitly stated she was an at-will employee (see Scott Dep. p. 50). In Illinois, implied covenants of good faith and fair dealing do not extend to at-will employees. Indeed, in *Criscione v. Sears, Roebuck & Co.*, 66 Ill.App.3d 664, 669–70, 23 Ill.Dec. 455, 459, 384 N.E.2d 91, 95 (1st

Dist.1978) defendant Sears prevailed on the same argument advanced by Scott here. The *Criscione* court stated:

> "[R]equiring an employer in an at will relationship to terminate an employee only for a legitimate business reason absent any other restrictions by contract or statute would place the courts in the untenable position of having to assess an employer's business judgment. There has been no attempt by the legislature to so alter the State's employment policy and such a step is not one for the courts to make. The rule in this state is that an employment at will relationship can be terminated for 'a good reason, a bad reason, or no reason at all.'"

This principle was reaffirmed in *Dykstra v. Crestwood Bank*, 117 Ill.App.3d 821, 826, 73 Ill.Dec. 307, 311, 454 N.E.2d 51, 55 (1st Dist.1983). Hence, Scott's argument alleging an implied covenant of good faith and fair dealing existed between the parties and was breached must fail.

The district court's dismissal of this action is AFFIRMED.