**Susan LEONG, et al., Plaintiffs,**

v.

**HILTON HOTELS CORPORATION, dba Hilton Hawaiian Village, et al., Defendants.**

Civ. No. 87–0840 ACK.

United States District Court,
D. Hawaii.

June 13, 1988.

Howard R. Green, Michael A. Lilly, Green, Ning, Lilly & Jones, Honolulu, Hawaii, for plaintiffs.

Robert Katz, Sabrina Toma, Torkildson, Katz, Jossem, Fonseca & Moore, Honolulu,

Hawaii, for Hilton Hotels, Dieter Seeger, Serge D'Rovencourt, McDonough.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT

KAY, District Judge.

This case comes before the court on Defendants' motions for partial summary judgment as to the allegations asserted in paragraphs 15 and 16 of the Complaint and as to the allegations asserted by Plaintiff Sato in Count III of the Complaint. The court, having considered the motions, the memoranda filed by the parties in support of and in opposition to the motions, and having heard the arguments of counsel, finds as follows:

This case is a Title VII employment discrimination action brought by several former employees of Hilton Hotels Corporation (Hilton) alleging that Hilton discriminated against them because of their Asian ancestry. Along with the federal claims, Plaintiffs have pendent state claims for, inter alia, wrongful discharge, wrongful constructive discharge, and intentional infliction of emotional distress. In the present motions, the court is presented with issues arising out of the claims for wrongful discharge and wrongful constructive discharge asserted by Plaintiffs Leong and Sato.

A. *Motion for Summary Judgment as to the Allegations in Paragraphs 15 and 16.*

In paragraphs 15 and 16 of the Complaint it is alleged that:

15. While Director of Human Resources, Leong was subjected to numerous disgusting sexual advances and harassments by D'Rovencourt who, at that time, was General Manager of the Village and therefore was her immediate supervisor. Leong refused to submit to his sexual advances.

16. Leong was thereafter told by D'Rovencourt and McDonough that she was being replaced as Director of Human Relations. She was told that her job would remain the same and that her replacement's job would be to "represent the Hilton at parties." When she asked why she was being replaced, she was told that although there was nothing wrong with her work, she did not have the "right image" for the Hilton. In fact, she was demoted because of her Asian ancestry.

Defendant moves for summary judgment on the factual allegations contained in these paragraphs for two reasons, (1) that they were not asserted in Leong's charge filed with the EEOC, and (2) that any claims arising from them are barred by the statute of limitations.

■ Leong's claim before the EEOC was only based on racial discrimination. The parties do not dispute that, in fact, a district court does not have jurisdiction over a Title VII claim unless that claim has been previously filed with the EEOC. *Lowe v. City of Monrovia,* 775 F.2d 998, 1003 (9th Cir.1986) *amended* 784 F.2d 1407 (9th Cir. 1986). Thus, a Title VII cause of action based on the sexual harassment allegations in paragraph 15 would be improper since there has been no EEOC claim filed for such.

A claim for employment discrimination is only timely if filed with the EEOC within 300 days of the alleged discrimination. Since Leong's discrimination claim was not filed until January 13, 1987, the allegations in paragraph 16 could not be used to support the Title VII claim.

■ The simple answer to this argument is that Leong is not making a Title VII claim based on the sexual harassment described in paragraph 15, and the discrimination allegations in paragraph 16 are not alleged in support of the Title VII claim. The allegations in paragraphs 15 and 16 are only intended to support Leong's independent causes of action for constructive wrongful discharge and intentional inflic-

**1568**

tion of emotional distress—pendent state claims which do not require EEOC consideration and which are not subject to the 300 day time limit.

Defendants assert that the constructive discharge and infliction of emotional distress causes of action are subject to the two year statute of limitations for tort actions imposed by Haw.Rev.Stat. § 657–7. The allegations of discrimination and harassment in paragraphs 15 and 16 occurred in 1983 and 1984, more than two years prior to the filing of the present action on November 26, 1987.

■ Under Hawaii law, the statute of limitations begins to run when a person discovers or should have discovered the negligent act, the damage, and the causal connection between the two. *Yamaguchi v. Queen's Medical Center*, 65 Haw. 84, 648 P.2d 689, 693 (1982). The damage alleged in the wrongful constructive discharge claim is, of course, the discharge of Leong, which did not occur until September 1986, well within the two year limitations period. Even though a cause of action for infliction of emotional distress based on the allegations in 15 and 16 might be barred because the damage would seem to be more immediate in such a case, paragraphs 15 and 16 allege facts which are relevant to the constructive discharge claim, which is not barred. The constructive discharge claim alleges that cumulative actions of the employer over time caused the damage, which damage actually occurred later. Although the fact that these actions were distant in time to the actual discharge might reduce their importance to the claim, it does not appear that these allegations could not have contributed to the damage, as a matter of law.

■ Although the allegations in these paragraphs are relevant to the wrongful discharge claim, Defendant Serge D'Rovencourt is not Plaintiff Leong's employer, and thus cannot be liable for a wrongful discharge. Since any claim for emotional distress arising out of the facts contained in these paragraphs would be barred under the two year limitation for such actions, paragraphs 15 and 16 do not contain any allegations which support a cause of action against D'Rovencourt. Since the complaint does not contain any allegations against D'Rovencourt personally other than these two paragraphs, summary judgment must be granted in favor of D'Rovencourt as to Counts I through IV of the Complaint.

**B. Motion for Summary Judgment on Plaintiff Sato's Claims Under Count III.**

Defendants seek summary judgment on Sato's claim for wrongful discharge on two grounds: (1) that as evidenced by a written agreement, Sato knew and agreed that his employment was at-will, and (2) that the Hilton has done nothing to alter the at-will employment relationship by creating an implied contract.

(1) *The written agreement.* When Sato first came to work at the hotel, which was before the Hawaiian Village was purchased by Defendant Hilton Hotels Corporation (Hilton), he signed a document in which he agreed:

> ... that this contract will terminate by my resignation or discharge, at any time during the month, without notice on either side; that any unpaid balance on account of wages shall not be due or payable until I have surrendered in good condition to the proper officer any of the this employer's property I may have in my custody.

Although Hawaii courts have not ruled on this precise issue, it has generally been held that the express provisions of an employment contract will operate to prevent an implied contract from being formed based on an employee handbook. *Crain v. Burroughs Corp.*, 560 F.Supp. 849, 851–52 (C.D.Ca.1983); *Gianaculas v. Transworld Airlines, Inc.*, 761 F.2d 1391, 1394 (9th Cir.1985); *Therrien v. United Airlines*, 670 F.Supp. 1517 (D.Colo.1987); *Scott v. Sears, Roebuck & Co.*, 798 F.2d 210, 215 (7th Cir.1986).

■ Plaintiffs make much of the fact that this agreement was made with the former owners of the hotel, and was not signed by the employer's representative. However, any argument that the document is legally invalid because it has not been executed in accordance with the formal requirements of a contract is undermined by the concept that in the area of employment contracts, strict formality is not required. *See Kinoshita v. Canadian Pacific Airlines,* 724 P.2d 110, 116 (Haw.1986). It is often simply a provision in an application for employment, not a formally executed contract, which has been held sufficient to preserve an at-will employment arrangement. *See, e.g. Gianaculas, supra.*

■ However, although it seems clear that Sato's employment was at-will when he was first hired by the hotel's former owners, this does not preclude the possibility that Hilton altered that arrangement later when they promulgated their "Employees Handbook." In *Kinoshita, supra,* the Hawaii Supreme Court held that such a handbook can alter a previously at-will employment arrangement. Under *Kinoshita,* the existence of an implied contract is to be determined based on the circumstances of the employment relationship, and if it is determined that later promulgated promises or procedures have become a part of the employment contract, they can be enforced by the court:

> [I]f an employer, for whatever reason, creates an atmosphere of job security and fair treatment with promise of specific treatment in specific situation, and an employee is induced thereby to remain on the job and not actively seek other employment, those provisions are enforceable components of the employment relations.

*Kinoshita,* 724 P.2d at 117. *See also Pine River State Bank v. Mettille,* 333 N.W.2d 622 (Minn.1983) (an employee hired for an indefinite period of time would recover for breach of his employment contract as subsequently modified by a newly adopted employee handbook). There have been other courts which have held that a subsequently promulgated handbook was not bargained for and thus does not alter the original arrangement, *see Johnson v. National Beef Packing Co.,* 220 Kan. 52, 551 P.2d 779 (1976); *Gates v. Life of Montana Ins. Co.,* 196 Mont. 178, 638 P.2d 1063 (1982), but *Kinoshita* specifically held that the later handbook, if found to have been intended to induce reliance, becomes a part of the employment contract by virtue of the fact that the employees give consideration for the promises either by remaining as employees or by not unionizing. Thus, although the signed statement of Sato is certainly one element which could be considered in the context of ascertaining the nature of the employment relationship in this case, it is not by itself determinative of it.

(2) *The effect of Hilton's actions.* The issue becomes, then, whether Hilton's Employees Handbook or other actions by Hilton or its agents operated to contractually alter the at-will employment of Sato. This is a question of fact, and as with any issue of fact, is to be determined at trial, unless reasonable minds could not differ as to the result. *Cook v. Heck's Inc.,* 342 S.E.2d 453 (W.Va.1986); *Woolley v. Hoffmann–La Roch, Inc.,* 99 N.J. 284, 491 A.2d 1257, 1270 (1985); *Waggenseller v. Scottsdale Memorial Hospital,* 147 Ariz. 370, 710 P.2d 1025, 1038 (1985). If, however, reasonable minds could not differ, summary judgment should be granted. *See Cook, supra.*

The main allegation in favor of Plaintiff's contention that Sato's at-will status was altered is the existence of the Employees Handbook. There are two sections which Sato states that he relied on in assuming that he would only be terminated for cause.

*Should You Leave*

You want to stay! and we want you to stay! Let's look upon your employment here as a permanent arrangement, and work together toward that end.

If you are thinking about resigning, you are asked to talk it over with us

first. If you still feel you must leave please give us two weeks notice to allow us time to seek a replacement and to complete your clearance process of turning in keys, uniforms, parking sticker and other equipment to the Personnel Office.

Regular employees released due to lack of work, or similar reasons will be given as much advance notice as possible regarding termination of employment.

\*   \*   \*   \*   \*   \*

*Employees Handbook*, Exhibit "B" to Plaintiff's Memorandum in Opposition, at p. 9.

*Causes for Disciplinary Action*

Any employee is subject to disciplinary action up to and including dismissal for causes such as, but not limited to the following:

1. Improper use of Hotel property, materials or facilities.

\*   \*   \*   \*   \*   \*

*Id.* at p. 12. A fairly extensive list of possible indiscretions follows, including a detailed list of actions which would "almost certainly" lead to dismissal.

In addition, Sato asserts that non-union employees became "permanent" after they passed a probationary period, and that it was his understanding that "[n]o one ever got fired for no reason in my 25 years with Hilton." Sato Deposition, Exhibit "H" at 53, 59. Also, a former Human Resource Director, Ted Baird, established a progressive discipline procedure under which certain steps were to be followed before a non-union employee would be terminated. Although this procedure was apparently established by way of a memorandum distributed to supervisors and department heads, it was not formally adopted by Hilton, was not incorporated into the employee handbook, and was unique to Baird, since it was not adopted or followed by the subsequent Director, defendant Nancy Isenberg, who was in charge when Sato was terminated.

■  *Kinoshita* does not state with clarity the standard for a finding that an at-will relationship has been altered, but the situation examined in that case is much more compelling than the present case. *Kinoshita* involved a situation where the employer had made "promises of specific treatment in specific situations," and had "encouraged reliance thereon" by the employees. In this case, the employee handbook does not make any promises at all, let alone that an employee would be treated a certain way in a certain situation. Plaintiffs have pointed to no facts which indicate that the handbook was issued by Hilton in order to induce employees to believe that they would only be terminated for cause. Although the facts in *Kinoshita* which indicate that the employer had promulgated the handbook in order to hold off unionization may not be determinative of whether the employer has induced reliance, there is no indication that Hilton had any intention or motivation to make its employees believe that they no longer were at-will employees. Indeed, if inducing reliance was intended, the handbook would seem to be a very poor vehicle for such, since nowhere in the handbook does it promise termination for cause or provide any rules or procedures for the determination of cause.

In *Toussaint v. Blue Cross*, 408 Mich. 579, 292 N.W.2d 880, 884 (1980), which is cited by the court in *Kinoshita*, the employer's policy manual stated that the company's policy was to discharge employees only for just cause. In *Cook, supra*, the court stated that "[a] common thread running through those cases where personnel manuals are viewed as contracts is the existence of a definite promise by the employer not to discharge the employee except for cause." The *Cook* court was willing to find that the handbook constituted a contractual arrangement because

"[t]he inclusion in the handbook of specified discipline for violations of particular rules accompanied by a statement that the disciplinary rules constitute a complete list is prima facie evidence of an offer for a unilateral contract of employ-

ment modifying the right of the employer to discharge without cause."

*Id.* *See also Pine River State Bank v. Mettille, supra,* 333 N.W.2d at 630 ("The provisions of the handbook ... set out in definite language an offer of a unilateral contract for procedure to be followed in job termination.") The handbook promulgated by Hilton makes no explicit promises and outlines no specific procedures. It would be unreasonable to hold that it was a contract offer to alter the at-will status of its employees.

*Kinoshita* does not, however, require that an employment status can only be altered by an employee manual. Rather, the test appears to be whether, considering all of the circumstances, the employer has " 'created a situation "instinct with an obligation." ' " *Id.* at 117, *citing Toussaint, supra,* 292 N.W.2d at 892.

■ Sato's subjective belief that his employment was not at-will, which is asserted in his affidavit, is not determinative of the existence of a contract, which must be determined based on the "outward manifestation of the parties." *Pine River, supra,* 333 N.W.2d at 626; *Therrien v. United Airlines,* 670 F.Supp 1517 (D.Colo.1987) ("Plaintiff may have a subjective expectation that he would be terminated only for just cause. However, plaintiff's subjective expectation does not create an enforceable contract right."); *Thompson v. St. Regis Paper Co.,* 102 Wash.2d 219, 685 P.2d 1081, 1085 (1984) (subjective understanding not sufficient to establish implied contract) In addition, Sato's affidavit is contradicted by his deposition testimony which indicates that he knew he could be terminated at any time. Sato deposition at p. 24.

Perhaps the most damaging aspect of this situation to Sato's claim is that even if Hilton were held to have contractually altered the at-will status of its employees by creating a situation which is somehow "instinct with an obligation," there would be no standards to apply in order to decide whether Hilton had breached its contract.

There are no officially promulgated procedures which Hilton has failed to follow, and no exclusive list of reasons which would give Hilton the right to terminate. If Hilton must find cause for a termination, there is no way for a court to decide whether Hilton failed to find such, since there were no procedures established which require certain individuals to find cause or to inform the employee of that cause. Sato has not only failed to assert facts which reasonably indicate that his employment status was altered, but he has failed to point out any specific procedures or standards which this court could require Hilton to follow.

■ Lastly, the procedures which Ted Baird promulgated do not appear to constitute sufficient representation by the employer to imply a contract to follow those procedures. These procedures were peculiar to Baird, who was only one of several Human Resources Directors during the 25 year employment of Sato. In his deposition, Baird states that each director was given the power to set up his own approach to personnel problems within the parameters established by his superiors, and that he would not have been surprised to find that others would have handled such matters differently. Baird's memo was only distributed to management employees, and was intended only to standardize disciplinary procedures. Neither party has been able to produce a copy of this memo, but Baird's testimony indicates that for a management employee, the required procedure consisted only of an oral, then a written warning, or sometimes a combined oral and written warning; and then termination. Baird Deposition at p. 104. According to Sato's own deposition testimony, Sato was in fact given notice that his work was deficient and was given several weeks to improve. Sato took a planned vacation instead. Sato deposition at p. 46–47. There is no evidence indicating that Baird implemented a policy which promised termination only for cause. In fact, Baird states in his deposition that he sought specifically

to preserve the at-will status of employees and make that status clear. Baird Deposition at p. 253–54. Thus, not only was Baird's program peculiar to his tenure as Human Resources Director, but it was not intended by Baird himself, let alone Hilton, to alter the at-will status of the employees.

Even assuming that Baird's memo set up some limited procedure for termination, the memo was only sent to department heads and supervisors, who were then required to coordinate discipline through Baird. The fact that disciplinary guidelines were distributed to management employees without evidence that the employer intended to induce reliance on those procedures has been held inadequate to establish the existence of a contractual alteration of an at-will employment. *See Soto v. Coca Cola USA,* Civ. No. 86–1037 (D.Haw. May 6, 1988); *Owens v. American National Red Cross,* 673 F.Supp. 1156 (D.Conn.1987). In this case, Baird's memo was only directed to management, and there is no evidence that Hilton had any intention to induce reliance on specified procedures. Indeed, the testimony of Baird indicates that the purpose of the memo was simply to make discipline more consistent by centralizing it. Baird deposition at p. 103.

Accordingly, it is hereby ORDERED that Defendants' Motion for Partial Summary Judgment as to the Allegations Asserted in Paragraphs 15 and 16 is DENIED, except as to Defendant Serge D'Rovencourt, as to whom summary judgment on Counts I through IV of the Complaint is GRANTED. Defendants' Motion for Partial Summary Judgment as to the Allegations Asserted by Plaintiff Sato in Count III is hereby GRANTED.