Phyllis CLINE, Plaintiff,

v.

GENERAL ELECTRIC CREDIT AUTO LEASE, INC., and Jerome Burd, Individually and as an agent for and on behalf of General Electric Credit Auto Lease, Inc., Defendants.

No. 89 C 6019.

United States District Court, N.D. Illinois, E.D.

Oct. 1, 1990.

**652**

Mary C. Martin, Law Offices of Mary C. Martin, Chtd., and David W. Andich, Chicago, Ill., for plaintiff.

Ellen E. McLaughlin, Robert J. Mignin, Kathleen M. Paravola, Eugene G. Bruno, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

General Electric Credit Auto Lease, Inc. ("GECAL"), and Jerome Burd have moved for summary judgment on Counts 1 and 2 of the Amended complaint of Phyllis Cline, a former employee of GECAL whom Mr. Burd supervised. Ms. Cline's first count is a claim under the Age Discrimination in Employment Act ("ADEA"), codified at 29 U.S.C. §§ 621 et seq. (1982). In her second claim, Ms. Cline contends that the defendants violated Title VII of the Civil Rights Act of 1964, as amended, codified at 42 U.S.C. §§ 2000e et seq. (1982). Ms. Cline's third claim is for battery, and is brought under state law. For the reasons stated below, this court grants the defendants' motion as to count 1, but denies it as to count 2.

### Background

These are the undisputed facts: Ms. Cline began working for GECAL in August 1987. She joined GECAL's Collections Department, and was partly responsible for contacting twenty to thirty persons each day to demand overdue car lease payments. Ms. Cline was aware when she began her job that the Department was an unusually stressful place to work, but took the job nonetheless.

Ms. Cline's immediate supervisors were Karen Sweeney, Ann Philbin, and Marilyn Sabounghi. They in turn reported to defendant Burd. Ms. Cline got along well with Mr. Burd at first, and would occasionally tease and joke with him. As time passed, however, it became evident to Ms. Cline that Mr. Burd was boorish, and that he contributed to the already tense atmosphere in her department. Mr. Burd yelled at the employees in his department and criticized their work performance. He also rudely commented on his employees' dress and appearance. He teased one female employee about her height and her bust. On another occasion he referred to Sabounghi as a "Jewish Princess," and slapped her on her upper arm several times. He once asked an Afro–American male employee who was dressed for the evening whether he was "going to a minstrel show," and remarked to him, "I didn't know that you could blush." He also did things like monitor the amount of time his employees spent in the office restroom.[1]

In Ms. Cline's eyes, however, Mr. Burd treated her especially badly. Not only did he criticize her dress and appearance, monitor her restroom time, and hit her, but he saved some very cruel remarks for her alone. On one occasion, when Ms. Cline stood to stretch while talking to a delinquent lessee on the phone, Mr. Burd told her to "sit your ass back down." Every now and then he would ask Ms. Cline how she spent her evenings, and openly speculate about her sexual relationship with her husband. What may have bothered Ms. Cline the most, however, was the way that Mr. Burd would tease her about her name. Originally, Mr. Burd started calling Ms. Cline not by her first name, Phyllis, but by the name "Filly." This name caught on in the office; several employees, including some of Ms. Cline's female co-workers, called her "Filly" too.

Ms. Cline soon tired of the name, and repeatedly told Mr. Burd to stop using it. One day Mr. Burd agreed. He went into the office and announced to the department that everyone should stop calling Ms. Cline "Filly." Instead, Mr. Burd told the department, everyone was to call Ms. Cline "Syphilis, the gift that keeps on giving." From then on Mr. Burd called Ms. Cline "Syphilis." At least one female co-worker

---

1. In her Statement of Material Facts, Ms. Cline alleges that he monitored the bathroom habits only of female employees. Ms. Cline does not refer the court to evidence which supports this contention, and so the court will disregard it.

used the name too, and it appears in an otherwise friendly note some of Ms. Cline's co-workers sent to her after she took medical leave from GECAL beginning May 17, 1988. Mr. Burd continued to use this name when he would phone Ms. Cline to monitor her progress during this leave.

Ms. Cline approached the U.S. Equal Employment Opportunity Commission ("EEOC") in early January 1989. She spoke to someone there, and complained of sexual harassment and age discrimination. She did not file a formal charge with the EEOC at that time. Instead, Ms. Cline, Ms. Sabounghi, and one other woman contacted Ms. Cline's present attorneys. After these discussions Ms. Cline returned to the EEOC on March 31, 1989, and filed a formal complaint. That complaint, which Ms. Cline read and signed, contains an "X" in the box for sex discrimination, but no "X" for age discrimination. The particulars of her charge were:

I. I began my employment in the Collections Department on August 31, 1987. I was sexually harassed by my superior and I was placed on short-term disability on May 17, 1988.

II. I was not given a reason why I was sexually harassed. I was told that I was denied long term disability because I had been with the company less than one year and they felt my problem was a reoccurrence of an old injury.

Ms. Cline's charge further stated that the last act of discrimination occurred May 17, 1988. Ms. Cline filed suit in this court after receiving a "Right to Sue" letter from the EEOC in May 1989.

### Age Discrimination

■ The defendants first argue that this court may not consider Ms. Cline's ADEA claim because she has not complied with the ADEA's charge-filing requirements. Title 29, § 626(d) states: "No civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the [EEOC]." The purposes of this requirement are threefold. First, it allows the EEOC to notify the charging party's employer. Second, it provides the EEOC with the opportunity to investigate the charge on its own. Third, it allows the EEOC to use its informal conciliation procedures to remedy the practice, thereby avoiding the need for litigation. See *Steffen v. Meridian Life Ins. Co.*, 859 F.2d 534, 542 (7th Cir.1988).

Ms. Cline's EEOC charge does not expressly accuse the defendants of age discrimination. She neglected to check the box on the charge form for age discrimination, and neither the term "age discrimination" nor words to that effect appear in the charge. While Ms. Cline could bring an ADEA claim if it were "like or reasonably related to the allegations of [her] charge and growing out of such allegations," *Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.*, 538 F.2d 164, 167 (7th Cir.1976) (en banc), the court is hard-pressed on these facts to find a reasonable relationship between an allegation of sexual harassment and one of age discrimination. Ms. Cline's only argument for allowing her ADEA claim to stand is that she *mentioned* age discrimination in her initial interview with the EEOC. While the ADEA's charge-filing requirements are flexible,[2] at a minimum, the complaining party must reduce her objections to *writing*. It is undisputed that Ms. Cline did that only when she read and signed the formal charge in March 1989, and it is that charge which determines the claims which she may maintain in this court. See *Steffen*, 859 F.2d at 544–45. The court thus must grant summary judgment in favor of the defendants on Count 1 of Ms. Cline's Amended Complaint.

### Sex Discrimination

1. *Timeliness*

■ As for Count 2, Ms. Cline's claim of illegal gender discrimination under Title VII, the defendants first contend that Ms. Cline's EEOC charge was untimely. The parties agree that in Illinois, a complaining party must file an EEOC charge within 300

---

**2.** See, for example, *Steffen*, 859 F.2d at 542–44 (any written document which contains suffi-

cient information to satisfy EEOC regulations may be a "charge" for purposes of the ADEA).

days of the alleged discriminatory practice. See 42 U.S.C. § 2000e–5(e). The defendants argue that the last allegedly discriminatory act against Ms. Cline was on May 17, 1988, the day on which Ms. Cline took disability leave and the date which she listed in her EEOC charge as being the last occasion of discrimination. Since Ms. Cline filed her charge on March 31, 1989, or 318 days after May 17, 1988, the defendants submit that Ms. Cline filed her EEOC charge too late.

The court may not enter judgment in favor of the defendants on this ground. First, the defendants present no evidence to support their contention that Ms. Cline's employment ended on the day on which she took disability leave. The court may reasonably infer from her taking such a leave that she still remained within GECAL's employ. Second, Ms. Cline presents evidence that notwithstanding what she put in her EEOC charge, Mr. Burd's harassment continued while she was on leave. This harassment consisted of calling her up, asking for "Syphilis," and inquiring as to her health. These calls occurred well within Title VII's 300–day limit.

### 2. Type of Harassment

The defendants next argue that while they may be guilty of harassing Ms. Cline, they did so for reasons unrelated to her gender, and hence they did not violate Title VII. In suggesting to the court how it should treat their dispute on this issue, the parties rely on recent decisions involving "sexual harassment," which the EEOC has defined as unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature. See 29 C.F.R. § 1604.11(a) (1989). Controversies involving sexual harassment have received unique treatment from the courts. In the usual gender discrimination case under Title VII, the primary inquire is whether the plaintiff's employer disadvantaged her on the basis of her gender. The courts answer this question through the scheme set forth in McDonnell Douglas Corp. v.

Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny. See, for example, Box v. A & P Tea Co., 772 F.2d 1372, 1376–78 & n. 3 (7th Cir.1985).

■ Under the McDonnell Douglas framework, a plaintiff establishes a prima facie case of gender discrimination under Title VII by showing (1) she was a woman, (2) she was qualified to receive a job or certain compensation, terms, conditions, or privileges of employment, and applied for them, (3) her employer refused to grant her the sought-after job, compensation, term, condition, or privilege, and (4) a male employee with similar qualifications received the job, compensation, term, condition, or privilege.

■ Sexual harassment cases differ because the discriminatory nature of the charged conduct speaks for itself. The main issue in sexual harassment cases is not whether the employer harassed the employee on the basis of her gender, but whether the claimed harassment affected the terms, conditions, or privileges of the plaintiff's employment, as Title VII uses those words. See 42 U.S.C. § 2000e–2(a)(1); Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 66–67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986); Scott v. Sears, Roebuck & Co., 798 F.2d 210, 213–14 (7th Cir.1986); Brooms v. Regal Tube Co., 881 F.2d 412, 418–19 (7th Cir.1989); Swanson v. Elmhurst Chrysler Plymouth, Inc., 882 F.2d 1235, 1238 (7th Cir.1989); King v. Board of Regents of Univ. of Wis. System, 898 F.2d 533, 537 (7th Cir.1990).

■ In cases involving the extension of a benefit in return for sexual favors ("quid pro quo" harassment), the effect on the plaintiff's job is clear and is seldom discussed. The tougher problems arise with so-called "hostile environment" harassment, the law being that only when the work environment becomes hostile does that environment become a "condition" of employment.[3] Implied within the analyses

---

**3.** The test for this type of harassment has two parts. First, it must be of a character that it

"would adversely affect the work performance and the well-being of a reasonable person ..."

of hostile environment sexual harassment, however, is a requirement that the harassment be "sexual" in nature. See *Scott*, 798 F.2d at 211 (allegations of sexual propositioning, sexually suggestive remarks, slapping of plaintiff's buttocks); *Brooms*, 881 F.2d at 416–17 & n. 1 (sexual propositions, advances, commentary, and pornography); *Swanson*, 882 F.2d at 1237 (allegations of sexually suggestive remarks); *King*, 898 F.2d at 534–35 (sexual innuendos, advances, and assaults). If the harassment is unrelated to sexual activity, the question of discriminatory intent reappears—and with it, the need for either direct proof of discrimination or an inference of discrimination resulting from the *McDonnell Douglas* analysis. See *Volk v. Coler*, 845 F.2d 1422, 1437 (7th Cir.1988) (suggesting that the *McDonnell Douglas* framework may be useful in sexual harassment cases).

### a. "Sexual" Harassment

■ This case presents allegations both of sexual harassment, as the EEOC has defined that term, as well as harassment on the basis of gender. The allegations of the former activity are minimal. The only harassment of a sexual nature is found in Mr. Burd's remarks about Ms. Cline's relationship with her husband, remarks which came according to Ms. Cline "now and then." These remarks by themselves would not unreasonably interfere with the work performance of the average employee in Ms. Cline's position, coming as infrequently as they did. See *Scott*, 798 F.2d at 214 (infrequent offensive comments by co-workers not debilitating enough to demonstrate hostile environment); *King*, 898 F.2d at 537 (strength of claim of hostile environment depends on the number of incidents and the intensity of each incident).

Mr. Burd's other remarks and actions, while offensive, were not sexual. His calling Ms. Cline "Syphilis" was a cruel play on her name, but Ms. Cline admitted in her deposition that she did not consider Mr. Burd's joking to imply that she had a venereal disease. Ms. Cline has put forth no evidence that Mr. Burd's one direction to her to take her seat contained anything other than a slang reference to the part of every human body, male or female, which occupies a chair. Similarly, Ms. Cline has not put forth evidence that Mr. Burd's timing of her bathroom breaks was sexual in nature.[4]

### b. "Gender" Harassment

■ If the harassment was not "sexual" as that term has been defined here, and this court holds that it was not, then Ms. Cline could still prevail on Count 2 if she were able to show that she was harassed because of her gender. As stated briefly above, harassment unrelated to sexual activity may nonetheless be actionable under Title VII's proscription against discrimination on the basis of sex, so long as the plaintiff is able to prove discriminatory intent. Of course here Ms. Cline is simply defending a motion for summary judgment. Thus, she need not prove her case, but rather, demonstrate that she has one.

In *Volk*, the court stated that "[a]n alleged victim of sexual harassment may also proceed under Title VII by employing the indirect method of proof including shifting burdens of production." 845 F.2d at 1437, citing *McDonnell*. Thus, if Ms. Cline were able to show that while the harassment to which she was subjected was not sexual in *nature*, it occurred *because of* her sex, and that it affected the terms and conditions of her employment, she would have an action under Title VII.

Accordingly, this court turns first to the *McDonnell Douglas* analysis. Under that framework, the plaintiff must first prove a prima facie case of discrimination by a preponderance of the evidence. If the plaintiff carries her burden, the employer must then "articulate some legitimate, nondis-

---

Second, the harassment must have actually affected the work performance and well-being of the plaintiff. See *Brooms*, 881 F.2d at 419.

**4.** Cline's evidence that Burd subjected other female workers to sexual harassment—for exam-

ple, making remarks about one worker's bust, and pinching another worker—does not make Burd's harassment of Cline sexual, although it is evidence that Burd discriminated against women. See discussion below.

criminatory reason" for the discriminatory action. Should the employer carry *its* burden, then the plaintiff may still prevail by proving, again by a preponderance of the evidence, that the reasons offered by the employer were merely a pretext for discrimination. *McDonnell*, 411 U.S. at 802–04, 93 S.Ct. at 1824–25. See also *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

■ In a case of "gender" harassment, as this court has postulated may exist here, the prima facie case of discrimination would consist of proof that 1) Ms. Cline is a member of a group protected under Title VII; 2) that she was harassed by her employer; 3) that the harassment was sufficiently severe or pervasive to alter the conditions of her employment; and 4) that male employees were not subjected to similar treatment. See *Meritor*, 477 U.S. at 67, 106 S.Ct. at 2405. Ms. Cline has obviously met the first requirement. As to the second and third, the question is whether she has offered evidence sufficient to demonstrate she was harassed severely enough to effect the conditions of her employment, and that the men with whom she worked were not similarly harassed.

■ Ms. Cline has alleged (and offered evidence to support her allegations) that Mr. Burd regularly yelled at her, called her insulting names, timed her bathroom breaks, made a variety of rude and boorish comments to her and asked her offensive questions. These allegations are sufficient to meet the *Brooms v. Regal Tube* standard for a "hostile working environment." That is, Mr. Burd's conduct would "adversely affect the work performance and the well-being of both a reasonable person and the ... plaintiff...." 881 F.2d at 419. And, as discussed below, Ms. Cline has offered evidence that it did in fact affect both her work performance and her well-being.

■ The question, therefore, is whether Ms. Cline has shown that the harsh treatment she received was qualitatively different from the treatment received by the men in her department. In her response to the GECAL's statement of material facts not in issue, Ms. Cline repeatedly refers to Mr. Burd's treatment of *subordinates* rather than his treatment of women, or herself as opposed to men. But in her deposition she stated that: "[Mr. Burd] yelled mostly at the older women. The younger women he did not yell as much, and he never yelled at the men that I could remember." [5] Ms. Cline has also offered evidence of several other women who were mistreated by Mr. Burd (see note 3 above). This is sufficient to establish her prima facie case.

GECAL has not offered evidence of a legitimate, non-discriminatory reason for Mr. Burd's behavior.[6] Thus, Ms. Cline's prima facia case is unrebutted. This court therefore will not grant summary judgment on count 2.

■ Two questions remain. The first is whether GECAL is liable for Mr. Burd's alleged behavior. An employer is not strictly liable for the sexual harassment of one employee by another. *Guess v. Bethlehem Steel Corp.*, 913 F.2d 463, 465 (7th Cir.1990). Rather:

> the employer, provided it has used due care in hiring the offending employee in the first place, is liable for that employee's torts against a coworker only if, knowing or having reason to know of the misconduct, the employer unreasonably fails to take appropriate corrective action. The employer acts unreasonably either if it delays unduly or if the action it does take, however promptly, is not

**5.** As this court noted earlier, there is evidence that at least once, Mr. Burd made an offensive comment to an African–American man. That evidence does not disprove Ms. Cline's theory that women were subjected to a greater degree of harassment than were men, and particularly men who were not also members of a group within Title VII's protection.

**6.** To say that Mr. Burd was merely "joking" with Ms. Cline and the other women he allegedly hit, pinched and yelled at does nothing to explain why he reserved such frivolity for the women he supervised, rather than *all* the people in his department, women and men.

reasonably likely to prevent the misconduct from recurring.

*Id.* at 465. See also *Brooms v. Regal Tube Co.,* 881 F.2d at 418–419.

 GECAL argues that Ms. Cline should not be able to pin liability upon it because it had an employee grievance procedure of which she was aware, but failed to use. Ms. Cline responds that she did not use the company grievance procedure because she feared reprisal, and that in any event, GECAL was aware of Mr. Burd's behavior because Mr. Burd's supervisor, Rick Weisner, had his office close enough to Mr. Burd's department to hear what went on, yet never criticized Mr. Burd's behavior. Ms. Cline alludes to, but did not proffer with her papers regarding this motion, other evidence that GECAL was aware of Mr. Burd's behavior. Nonetheless, she has submitted enough evidence to put the question in issue, and that is enough to defeat GECAL's motion for summary judgment on the claim against it.

 The last question is whether the physical problems from which Ms. Cline claims to suffer were caused and/or aggravated by the conditions at GECAL. The parties have submitted conflicting medical and other evidence; summary judgment on the question is inappropriate. The question should be resolved by trial, or, of course, settlement.

### Conclusion

This court grants Mr. Burd and GE-CAL's motion for summary judgment on count 1, and denies it as to count 2. Count 3 also remains pending. The motion to dismiss is moot, and is dismissed.