GUY KINOSHITA, Plaintiff-Appellant, *v.* CANADIAN PACIFIC AIRLINES, LIMITED, and D. W. MERRELL, Defendants-Appellees

(CIVIL NO. 83-0011)

RONALD K. NAKASHIMA, Plaintiff-Appellant, *v.* CANADIAN PACIFIC AIRLINES, LIMITED, and D. W. MERRELL, Defendants-Appellees

(CIVIL NO. 83-0012)

NO. 11148

(9TH CIR. NO. 83-0011)

AUGUST 26, 1986

LUM, C.J., NAKAMURA, PADGETT, HAYASHI, AND WAKATSUKI, JJ.

OPINION OF THE COURT BY NAKAMURA, J.

The United States Court of Appeals for the Ninth Circuit has certified to this court that there is a question concerning the law of Hawaii which is determinative of a pending appeal from the United States District Court for the District of Hawaii and there is no clear controlling precedent in the decisions of the appellate courts of the State.[1] The question is whether the Employee Rules of Canadian Pacific Airlines Limited (CP Air) constitute a contract enforceable by employees. Reviewing the facts outlined in the certification, we answer affirmatively.

---

[1]Rule 13(a) of the Hawaii Rules of Appellate Procedure, as amended June 9, 1986, provides for the certification of questions on Hawaii law to the Hawaii Supreme Court by federal courts. The rule reads:

CERTIFICATION OF QUESTION OF HAWAII LAW BY FEDERAL APPELLATE COURTS.

(a) When Certified.  When a federal district or appellate court certifies to the Hawaii Supreme Court that there is involved in any proceeding before it a question concerning the law of Hawaii which is determinative of the cause, and that there is no clear controlling precedent in the Hawaii judicial decisions, the Hawaii Supreme Court may answer the certified question by written opinion.

I.

A.

CP Air terminated the employment of two part-time passenger agents, Guy Kinoshita and Ronald K. Nakashima, on October 28, 1982. Charging the defendants with breach of contract, wrongful discharge, infliction of emotional distress, and violations of Title VII of the Civil Rights Act of 1964 and Hawaii Revised Statutes (HRS) § 378-2, the terminated employees filed suits individually in the Circuit Court of the First Circuit, State of Hawaii, against CP Air and D.W. Merrell, CP Air's Hawaii manager. The plaintiffs sought reinstatement in employment, damages, attorneys' fees, and costs. The defendants removed the causes to the United States District Court for the District of Hawaii, where they were consolidated for hearing and disposition.

The consolidated cases were tried by the district court. At the close of plaintiffs' evidence, the court dismissed all claims against Merrell, as well as the Title VII and emotional distress claims against CP Air. At the close of all evidence, the court ruled the plaintiffs had failed to prove any of the remaining claims and awarded judgment to the defendants on all counts. The plaintiffs appealed the district court's rulings on their claims for breach of contract, unlawful discharge, and violation of HRS § 378-2. A panel of the Court of Appeals for the Ninth Circuit heard argument on the appeal but found the outcome hinged "on a question of Hawaii state law on which there is no clear controlling precedent in the Hawaii judicial decisions." The appellate court thus summarized the dispositive facts and certified the following question to this court:

"Do CP Air's Employee Rules under Hawaii State law constitute a contract enforceable by the employees?"

B.

The rules in question were initially promulgated in 1978, after Kinoshita and Nakashima began working for the airline, to stem a union attempt to organize CP Air's unorganized workers. Copies of the memorandum containing the rules were distributed to the airline's passenger agents, ground hostesses, clerical employees, and station attendants in the United States. Nakashima testified at trial that he saw a copy when the document was circulated. Kinoshita said he was aware that

employee rules had been issued during a union organizational drive, but the record does not indicate when he actually learned of their promulgation.

The rules contain specific provisions covering the suspension and discharge of employees. Rule 27 in pertinent part reads:

27.04   No permanent employee will be disciplined or discharged until his case first has been investigated. The decision in such cases to be reached within ten (10) calendar days from the date of suspension.

27.05   No employee may be held out of service without pay pending investigation for more than seven (7) work days. . . .

27.06   If, as a result of any hearing or appeal therefrom, as provided herein, an employee is exonerated, who has been held out of service, he shall be reinstated without loss of seniority, and shall be paid for such time lost in an amount that he would have earned as regular salary had he continued to be in service during that period.

Provision is also made for the filing of grievances by employees. The relevant portions of Rule 26 read:

26.01   Employees who consider themselves unfairly treated shall have the right to file a grievance detailing the complaint and requesting a hearing.

.   .   .   .

26.05   Should no decision be given within the time limit specified, or the decision be unsatisfactory, the employee may appeal progressively to the Department Head, applicable Vice-President and, in turn, to the President or his designated representative.

In 1979, in the midst of yet another unsuccessful union organizational effort among the same employees, CP Air addressed another communication to them. The circular emphasized that "our written employment arrangements with you . . . constitute[] an enforceable contract between us under [the] labour law of the state in which you work. Thus your rights in your employment arrangement are guaranteed."[2] The record contains no evidence that Kinoshita and Nakashima

---

[2]The communication was in the form of a letter to each employee and read in relevant part as follows:

Dear Fellow Employee:

You are perhaps aware that an application has again been made by the Brotherhood of

received the communication:

On August 2, 1982, CP Air transmitted this terse memorandum to its employees: "Any employee who commits any act of an illegal nature when off duty which harms or has the potential to harm the Company's reputation will be subject to disciplinary action which may include dismissal." On October 19, 1982, Kinoshita and Nakashima, who then were also part-time employees of World Airways, were arrested along with three other World employees at the Honolulu International Airport by agents of the federal Drug Enforcement Agency. The five were suspected of being involved in a conspiracy to promote cocaine. CP Air's airport manager was apprised of the events, and he passed the information on to the airline's Hawaii manager.

CP Air suspended Kinoshita and Nakashima without pay when it learned they had been arrested. Concluding from an investigation of the circumstances surrounding the arrests that the conduct of the two employees "might adversely affect passenger safety, might harm the company's reputation, and might adversely affect [its] business contracts," the airline discharged them. In effecting the discharges, the employer relied on the memorandum of August 2, 1982. It further advised Kinoshita and Nakashima that "no appeal of [the discharge actions] would be allowed because of the gravity of their misconduct and because the decision to discharge was made in CP Air's Vancouver

---

Railway, Airline and Steamship Clerks Union to organize employees in the United States CP Air supports your right to accept or reject such representation.

You may recall that in a secret ballot election in 1978 you overwhelmingly rejected representation by the Union. We assume this vote of confidence is based on your knowledge that effective July 1st of each year we have always improved salaries. benefits and working conditions to ensure we continue to maintain a most desireable [sic] working environment for the betterment of all. CP Air appreciates your confidence and we assure you a continuation of this practise that is set forth in our written employment arrangements with you which constitute[] an enforceable contract between us under [the] labour law of the state in which you work. Thus your rights in your employment arrangement are guaranteed.

.   .   .

Sincerely,
L.R. Barnes
Director
Compensation & Employee Benefits

headquarters."

## II.

Kinoshita and Nakashima were not protected by a collective-bargaining agreement. Like a majority of the nation's labor force, they worked under employment arrangements of indefinite duration. "Such . . . employment contract[s] [are] typically held to be terminable at the will of either [employer or employee], for any reason or no reason." *Parnar v. Americana Hotels, Inc.*, 65 Haw. 370, 374, 652 P.2d 625, 627 (1982) (citations omitted). But "[i]n apparent recognition of the plight of the largely unprotected private sector employee, many state courts have modified or adopted exceptions to the terminable at-will doctrine by employing two general approaches, one in the nature of contract and the other sounding in tort, to circumvent harsh application of the doctrine." *Id.* at 375-76, 652 P.2d at 628. We joined the jurisdictions subjecting "the employer's power of discharge to closer judicial scrutiny in appropriate circumstances" when we considered *Parnar. Id.* at 377, 652 P.2d at 629.

The plaintiff there, "whose contract [of employment] was of indefinite duration hence terminable at the will of her employer[], . . . sue[d] for damages for an allegedly retaliatory discharge." *Id.* at 371, 652 P.2d at 626. Finding no genuine issue of material fact, the circuit court awarded the defendant employer summary judgment. On appeal, the plaintiff argued she "ha[d] a right to sue for a discharge in bad faith or in contravention of public policy[,]" and the presence of genuine issues of material fact rendered a summary disposition of her claims inappropriate. *Id.* at 373, 652 P.2d at 627

We were unwilling "to imply into each employment contract a duty to terminate in good faith [and thereby] subject each discharge to judicial incursions into the amorphous concept of bad faith." *Id.* at 377, 652 P.2d at 629. For we were "not persuaded that protection of employees require[d] such an intrusion [into] the employment relationship or such an imposition on the courts." *Id.* Yet we were convinced that where the "discharge of an employee violates a clear mandate of public policy[,]" his "employer [should] be . . . liable in tort." *Id.* at 380, 652 P.2d at 631. We therefore vacated the judgment and remanded the case to afford the plaintiff an opportunity to make proof of allegations that she was discharged to prevent her from giving evidence of the employer's illegal anti-competitive practices.

III.

A.

The "bad faith" exception to the at-will doctrine espoused in *Monge v. Beebe Rubber Co.,* 114 N.H. 130, 316 A.2d 549 (1974), but rejected in *Parnar,* is but one of several contractual theories adopted by courts to ameliorate the harshness of the at-will doctrine. We observed in *Parnar* that contractual relief had been afforded employees, for example, "through implying a promise for employment of a fixed duration from the facts and circumstances surrounding the making of an agreement." 65 Haw. at 376, 652 P.2d at 629. But we did not pass on the possible applicability of other theories of contractual recovery "because none [was] urged before the trial court or this court." *Id.*

Courts have also decided that the previously unfettered right of employers to discharge employees "can be contractually modified and, thus, qualified by statements contained in employee policy manuals or handbooks issued by employers to their employees." *Thompson v. St. Regis Paper Co.,* 102 Wash. 2d 219, 228, 685 P.2d 1081, 1087 (1984) (citations omitted). "Under [one] approach the requisites of contract formation, offer, acceptance and consideration are necessary predicates to establishing that policies in an employment manual are part of the employees' original employment contract or part of the employment contract as modified by the parties." *Id.* (citations omitted). The district court's conclusion that CP Air's "Employee Rules do not constitute a binding contract because there was no meeting of the minds and [the employer] retained the right to unilaterally change the rules" is, of course, consistent with the decisions of courts following this approach.

Other courts, however, have employed still another contractual theory to mitigate the severity of the doctrine when the circumstances are appropriate for relief. Thereunder,

the parties' minds need not meet on the subject; nor does it matter that the employee knows nothing of the particulars of the employer's policies and practices or that the employer may change them unilaterally. It is enough that the employer chooses, presumably in its own interest, to create an environment in which the employee believes that, whatever the personnel policies and practices, they are established and official at any given time, purport to be fair, and are applied consistently and uniformly to each employee. The employer

has then created a situation "instinct with an obligation".
*Toussaint v. Blue Cross & Blue Shield,* 408 Mich. 579, 613, 292 N.W.2d 880, 892 (1980) (footnotes omitted).

The plaintiff in *Toussaint* sued Blue Cross & Blue Shield of Michigan for wrongful discharge. He testified he was given a "Supervisory Manual" and "Guidelines" containing the employer's personnel policies and procedures, including grounds for termination and procedures relating to discipline and termination, at the time of hire. But when terminated, he was not accorded all of the procedures set forth in the manual. The jury returned a verdict in Toussaint's favor, and Blue Cross & Blue Shield appealed. The Michigan Court of Appeals reversed the judgment. The Michigan Supreme Court, however, reinstated the verdict on grounds that

> employer statements of policy, such as the Blue Cross Supervisory Manual and Guidelines, can give rise to contractual rights in employees without evidence that the parties mutually agreed that the policy statements would create contractual rights in the employee, and, hence, although the statement of policy is signed by neither party, can be unilaterally amended by the employer without notice to the employee, and contains no reference to a specific employee, his job description or compensation, and although no reference was made to the policy statement in pre-employment interviews and the employee does not learn of its existence until after his hiring.

*Id.* at 614-15, 292 N.W.2d at 892. Other courts have adopted the reasoning of *Toussaint* in carving out exceptions to the applicability of the at-will doctrine.

The Supreme Court of Washington, for one, was also convinced "that the principal, though not exclusive, reason employers issue such manuals is to create an atmosphere of fair treatment and job security for their employees." *Thompson v. St. Regis Paper Co.,* 102 Wash. 2d at 228, 685 P.2d at 1087 (citation omitted). "It would appear," the court said, "that employers expect, if not demand, that their employees abide by the policies expressed in such manuals." *Id.* at 230, 685 P.2d at 1088. And "[t]his may create an atmosphere where employees *justifiably rely* on the expressed policies and, thus, justifiably expect that the employers will do the same." *Id.* (emphasis in original). Thus, the court's ruling was "that if an employer, for whatever reason, creates an atmosphere of job security and fair treatment with promises of *specific treatment in specific situations* and an employee is induced thereby to remain on the job

and not actively seek other employment, those promises are enforceable components of the employment relationship. . . . *See Restatement (Second) of Contracts* § 2 (1981) (promise is a manifestation of intention *to act or refrain from acting in a specified way,* so made as to justify a promise in understanding a commitment has been made)." *Id.* at 230, 685 P.2d at 1088 (emphasis in original).

The question posed by the plaintiff's appeal from a summary judgment in *Leikvold v. Valley View Community Hospital,* 141 Ariz. 544, 688 P.2d 170 (1984), was "whether representations in a personnel manual might ever constrain an employer's power to terminate an employment relationship which would otherwise be terminable at will." *Id.* at 546, 688 P.2d at 172. Viewing the terminable-at-will doctrine or rule as "at best a rule of construction[,]" and "not a limit on the parties' freedom to contract[,]" *id.* at 547, 688 P.2d at 173, the Supreme Court of Arizona vacated the summary judgment and remanded the case for trial. In the court's opinion, "if an employer [chooses] to issue a policy statement, in a manual or otherwise, and, by its language or by the employer's actions, encourages reliance thereon, the employer cannot be free to only selectively abide by it." *Id.* at 548, 688 P.2d at 174. "Having announced a policy," the court said, "the employer may not treat it as illusory." *Id.*

B.

We think the employer here can hardly be free to selectively abide by the policies and procedures set forth in the Employee Rules which were "promulgated in an effort to defeat a unionization attempt." Surely, CP Air was striving to create an atmosphere of job security and fair treatment, one where employees could expect the desired security and even-handed treatment without the intervention of a union, when it distributed copies of the rules to the employees who were to vote in a representation election. It attempted to do so with promises of specific treatment in specific situations; it encouraged reliance thereon, particularly during the second attempt at unionization, with statements that "our written employment arrangements with you . . . constitute[] an enforceable contract" and "your rights in your employment arrangement are guaranteed." CP Air thus "created a situation 'instinct with an obligation.'" *Toussaint v. Blue Cross & Blue Shield,* 408 Mich. at 613, 292 N.W.2d at 892 (citing *Wood v. Lucy, Lady Duff-Gordon,* 222 N.Y.

88, 118 N.E. 214 (1917); *McCall Co. v. Wright,* 133 A.D. 62, 117 N.Y.S. 775 (1909)).

If evidence of reliance other than the continued performance of work by the employees were required, the two unsuccessful union campaigns to organize CP Air's passenger agents, ground hostesses, clerical employees, and station attendants in the United States stand as mute yet telling testimony of such fact. Furthermore, the plaintiffs' right to compel CP Air to live up to its promises does not turn on whether they received all of the communications addressed to the employees or not. An employment contract, as we have seen, "does not always follow the traditional model, in which contractors bargain over terms, and courts seek to implement individual intentions." Pettit, *Modern Unilateral Contracts,* 63 B.U.L. Rev. 551, 583 (1983). "[A] modern employment contract is [more] often a standardized agreement . . . between the employer *organization* and the *class* of employees[.]" *Id.* (emphasis in original). When CP Air told employees that "our written employment arrangements with you . . . constitute[] an enforceable contract," it could only have been referring to such an agreement. There was, of course, no evidence of bargaining on an individualized basis.

A standardized agreement "is interpreted wherever reasonable as treating alike all those similarly situated, without regard to their knowledge or understanding of the standard terms of the writing." *Restatement (Second) of Contracts* § 211(2) (1979). Inasmuch as CP Air circulated the rules with an intention "to create expectations and induce reliance by employees as a group[,]" it "should not be able to escape liability on the grounds that a particular employee was unaware of the [rules] and thus did not receive a promise." Pettit, *supra.*

For the reasons given above, our answer to the certified question is: CP Air's Employee Rules constitute a contract enforceable by the employees.

*Edward deLappe Boyle (Jeffrey S. Portnoy* with him on the briefs; *Cades, Schutte, Fleming & Wright,* of counsel) for appellants.

*Todd M. Sloan (Hill, Farrer & Burrill,* of counsel) (with him on the brief: *Stanley E. Robin; Hill, Farrer & Burrill,* of counsel; *Michael A. Freed* and *Leslie Hayashi; Rush, Moore, Craven, Kim & Stricklin,* of counsel) for appellees.

On the briefs for Amici Curiae:

*Barry W. Marr* and *Anna M. Elento-Sneed (Carlsmith, Wichman, Case, Mukai & Ichiki,* of counsel) for Amicus Hawaii Employers Coun-

cil.

*Robert S. Katz, Jared H. Jossem, Richard M. Rand* and *Jeffrey S. Harris* (*Torkildson, Katz, Jossem, Fonseca & Moore,* of counsel) for Amici Chamber of Commerce of Hawaii, Hawaii League of Savings Associates, Council of Hawaii Hotels, Hawaii Bankers Association, Eagle Distributors, Aloha Airlines, Inc. & Air Service Corp.